**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

CH PROPERTIES, INC.,

      **Plaintiff,**

          **v.**                **CIVIL NO.** 13-1354 (FAB)

FIRST AMERICAN TITLE INSURANCE
COMPANY,

      **Defendants.**

**OPINION AND ORDER**

BESOSA, District Judge.

    Before the Court are the cross motions for summary judgment filed by First American Title Insurance Company ("FATIC"), (Docket No. 54), and CH Properties, Inc. ("CH Properties"), (Docket No. 58).  Having reviewed the motions as well as the corresponding oppositions and replies, the Court **GRANTS in part and DENIES in part** FATIC's motion for summary judgment and **GRANTS in part and DENIES in part** CH Properties's motion for summary judgment.

**I.  Standard**

    Summary judgment serves to assess the evidence and determine if there is a genuine need for trial.  <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 50 (1st Cir. 1990).  The Court may enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it has the potential to "affect the suit's outcome."  <u>Cortes-Irizarry</u>

v. Corporacion Insular de Seguros, 111 F.3d 184, 187 (1st Cir.
1997).  A dispute is "genuine" when it "could be resolved in favor
of either party."  Calero-Cerezo v. U.S. Dep't. of Justice, 355
F.3d 6, 19 (1st Cir. 2004).  The party moving for summary judgment
has the initial burden of "demonstrat[ing] the absence of a genuine
issue of material fact" with definite and competent evidence.
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Maldonado-Denis
v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).  It must
identify "portions of 'the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any'" which support its motion.  Celotex, 477 U.S.
at 323 (citing Fed. R. Civ. P. 56(c)).  Once a properly supported
motion has been presented, the burden shifts to the non-moving
party "to demonstrate that a trier of fact reasonably could find in
[its] favor."  Santiago-Ramos v. Centennial P.R. Wireless Corp.,
217 F.3d 46, 52 (1st Cir. 2000) (internal citation omitted).  In
making this assessment, the Court must take the entire record in
the light most favorable to the non-moving party and draw all
reasonable inferences in its favor.  Farmers Ins. Exch. v. RNK,
Inc., 632 F.3d 777, 779-80 (1st Cir. 2011).

    Cross-motions for summary judgment do not alter the summary
judgment standard, but rather require the trial court to determine
whether either of the parties deserves judgment as a matter of law
on facts that are not disputed.  See Adria Int'l. Grp. Inc. v.

Ferre Dev., Inc., 241 F.3d 103, 107 (1st Cir. 2001); Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996). When deciding cross-motions for summary judgment, the Court must consider each motion separately, drawing inferences against each movant in turn.  Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

## II.  Material Facts

### A.  Issuance of Agreements Over the 5-Cuerda Tract of Land

FATIC is a California corporation, with its principal place of business in Santa Fe, Orange County, California, and is duly authorized by the Puerto Rico Insurance Commissioner's Office to sell title insurance in Puerto Rico.  (Docket No. 71-1 at p. 1.) Title Security Group, Inc. ("TSG") is a Puerto Rico corporation that, at all times relevant to the Complaint, functioned as FATIC's general agent in Puerto Rico.[1]  Id.  CH Properties is a Puerto Rico corporation and a wholly-owned subsidiary of HR Properties, Inc. ("HR Properties").  (Docket No. 71-1 at p. 3; Docket No. 67[2] at ¶ 1.)

---

[1] In 2002, TSG was FATIC's General Agent, and FATIC had a twenty percent (20%) interest in TSG.  Since 2003, TSG has been a wholly-owned corporation of FATIC.  (Docket No. 55-2 at pp. 9-10.)

[2] The Court notes that unlike CH Properties, FATIC did not include the text that it admits or denies in its opposition to plaintiff's statement of uncontested facts.  (See Docket No. 67.) In the interest of avoiding unnecessary duplication, the Court cites FATIC's answers to plaintiff's statement of uncontested facts, (Docket No. 67), without also citing to the corresponding facts set forth in CH Properties' brief, (Docket No. 58-1).

On March 11, 1996, the Puerto Rico Recreational Development Company (predecessor of the Puerto Rico National Parks Company), the Muncipality of Carolina, and an entity by the name of Desarrollos Hoteleros de Carolina, Inc. ("Desarrollos Hoteleros") entered into an "Agreement of Lease" over a 5.0 *cuerda* tract of land located in Isla Verde, Puerto Rico ("the Property"), by which Desarrollos Hoteleros acquired title over the leasehold interest in the Property. (Docket No. 71-1 at p. 2.) Three years later, on August 9, 1999, Desarrollos Hoteleros transferred its title rights and privileges under the Agreement of Lease to an entity by the name of Sunshine Isle Inn, LLC ("Sunshine"). Id. Then, on August 21, 2001, Sunshine entered into a "Sale-Purchase Agreement" with HR Properties, by which it granted HR Properties, *inter alia*, the option to acquire Sunshine's leasehold rights over the Property. Id.

On August 5, 2002, HR Properties and CH Properties, the plaintiff in this case, signed an "Assignment of Rights," by which HR Properties assigned to CH Properties all of its rights under the Sale-Purchase Agreement with Sunshine regarding the acquisition of title over the leasehold in the Property. Id. at p. 3. Also on that date, Sunshine and CH Properties entered into a "Deed of Assignment of Lease," also described as Deed No. 72 or "Lease Agreement", by which Sunshine "absolutely and irrevocably assign[ed], transfer[red] and convey[ed] to [CH Properties] all of

the rights, title and interest of [Sunshine] in and to the Lease Agreement." (Id.; Docket No. 55-6 at p. 4; Docket No. 67 at ¶ 2.) In order to purchase the Lease Agreement, CH Properties secured a loan from FirstBank Puerto Rico ("FirstBank") in the amount of $6,750,000. (Docket No. 67 at ¶ 3.) CH Properties also subscribed and issued a mortgage note in favor of FirstBank in the principal sum of $7,425,000 on August 5, 2002, which in turn was secured by a first mortgage lien over the leasehold estate. (Docket No. 71-1 at pp. 3-4; Docket No. 67 at ¶ 4.)[3]

As part of the financing transaction between CH Properties and FirstBank for acquisition of the leasehold, FATIC issued two separate title insurance policies on August 5, 2002: (1) a loan or lender's policy in favor of FirstBank as the

---

[3] The "Loan Agreement" with FirstBank was secured by CH Properties and seven other co-borrowers, who "assume[d], jointly and severally, all of the obligations of Borrower towards FirstBank" under the Loan Agreement. (Docket No. 71-1 at p. 4.) The transition that led to CH Properties' acquisition of title over the leasehold rights in the Property included a related deal or transaction by its parent company, HR Properties, for the purchase of what used to be known as the Crowne Plaza Hotel (now known as the Marriot Courtyard), which is located adjacent to the Property. That transaction was financed by Scotiabank de Puerto Rico ("Scotiabank") and closed on the same date, August 5, 2002. Id.

insured,[4] and (2) an owner's policy in favor of CH Properties as
the insured.[5]  (Docket No. 71-1 at p. 4; Docket No. 67 at ¶ 5.)  CH
Properties paid premiums to FATIC for both policies, amounting to
$16,453.00, which includes amounts for other policies issued on the
same date as part of the overall transaction.  (Docket No. 67 at
¶ 6; Docket No. 58-1 at p. 148.)

     As FATIC's general agent in Puerto Rico, TSG oversaw the
underwriting and issuance of the Owner's Policy.  (Docket No. 71-1
at pp. 11-12.)  Jose Chipi-Millares is currently TSG's President,
and at the time of the issuance of the Owner's Policy in 2002, he
was the Executive Vice President with principal duties in sales and
marketing as well as mortgage residential banking.  (Docket No. 55-
2 at p. 12.)  Chipi-Millares attended the closing of the
transactions that took place on August 5, 2002, and he claims to
have delivered the Owner's Policy.  Id. at pp. 17-20.  Attorney
Eduardo Ferrer-Ramirez de Arellano has been Corporate Director and

---

     [4] FirstBank was issued Policy No. FA-31-626399, with a policy
jacket for an American Land Title Association ("ALTA") 1992
standard form Loan Policy (10/17/92), and corresponding schedules
A and B (hereinafter, the "Lender's Policy").  (Docket No. 71-1 at
pp. 4-5.)  The Lender's Policy specifies in its Schedule A that
"[t]he estate or interest in the land which is encumbered by the
insured mortgage is:  LEASEHOLD," and that "[t]itle to the estate
or interest in the land is vested in: CH PROPERTIES, INC."  Id. at
p. 5.

     [5] CH Properties was issued Policy No. FA-33-447620, with a
policy jacket for an ALTA 1992 standard form Owner's Policy
(10/17/92), and corresponding schedules A and B (hereinafter, the
"Owner's Policy").  (Docket No. 71-1 at p. 5.)

Secretary of the Board of CH Properties since its incorporation, and he participates in all legal and operational matters having to do with the company. (Docket No. 71-1 at p. 12.)  Ferrer-Ramirez was in charge of the acquisition and financing of the leasehold interest in the Property insured by the Owner's Policy, and he appeared at the closing that took place on August 5, 2002, as the representative of CH Properties. Id. at pp. 12-13.  He was the person at CH Properties who would submit documentation to FATIC's general agent for the underwriting of the risk behind the title policy. (Docket No. 55-3 at pp. 31 & 51.)  Although Ferrer-Ramirez accepts that CH Properties bought the Owner's Policy, he cannot recall who at CH Properties placed the order for the insurance policy, the reasons that the company may have had to buy such a policy, or having received the policy on the date of closing. (Docket No. 71-1 at p. 13.)  The "closing document" dated August 5, 2002 does not list the Owner's Policy among the "copies" of documents maintained by FirstBank in its files. (Docket No. 58-1 at pp. 176-77.)  Ferrer-Ramirez also testified that he learned about the existence of the Owner's Title Policy issued by FATIC during a deposition taken as part of the federal action in October 2008. (Docket No. 55-3 at pp. 34-36, 65.)  Attorney Francisco Pujols was a person with authority to order a title insurance policy on CH Properties's behalf; he testified that he remembers asking for an owner's policy, that he knew that the policy existed,

and that he must have seen it on the date of closing because he was present at the meeting.  Id. at pp. 13–14.  Attorney Pujols had been hired to help negotiate the Sale-Purchase Agreement between HR Properties and Sunshine, and assist with the financing transactions.  Id. at p. 14.  After the closing, CH Properties initiated the process to obtain governmental permits and endorsements needed to develop the condo-hotel intended for the 5.0-*cuerda* tract of land.  (Docket No. 67 at ¶ 10.)

### B.   State and Federal Lawsuits Regarding the Property

On April 1, 2005, the Municipality of Carolina filed a complaint before the Puerto Rico Court of First Instance, Carolina Superior Division, against HR Properties and several local government agencies, challenging the validity of the permitting process followed by HR Properties for the development of a hotel on the Property.[6]  (Docket No. 71-1 at p. 16; Docket No. 67 at ¶ 12.) Five days later, an organization called Comite de Vecinos de Isla Verde ("Isla Verde Residents Committee," or "IVRC" for its English acronym) filed a complaint before the same Commonwealth Court against CH Properties, FirstBank, and other entities, alleging defects in the permitting process for the proposed development of a hotel on the Property, and the nullity of the Lease Agreement as

---

[6] That case is <u>Municipio de Carolina v. HR Properties et al.</u>, FPE 2005-0226.

an improper alienation of property in the public domain.[7] (Docket No. 71-1 at p. 16; Docket No. 67 at ¶ 13.)  Shortly before April 6, 2005, representative members of the IVRC trespassed upon the Property and invaded a portion of the 5-*cuerda* tract of land, claiming that the property belongs to the public. (Docket No. 71-1 at p. 16; Docket No. 67.)  A third lawsuit was filed before the Commonwealth Court on April 7, 2005, against CH Properties, FirstBank, and other entities in which the Puerto Rico National Parks Company also alleged the invalidity of the Lease Agreement as an improper alienation of property in the public domain.[8] (Docket No. 71-1 at p. 17; Docket No. 67 at ¶ 19.)  Shortly thereafter, the Commonwealth Court consolidated the three cases into one action, hereinafter "the State Court Actions." (Docket No. 71-1 at p. 17; Docket No. 67 at ¶ 20.)  From the beginning of the suits, CH Properties retained the Andreu & Sagardia Law Firm as its legal counsel in the State Court Actions.  (Docket No. 67 at ¶ 21.)

On June 9, 2005, the Commonwealth Court issued an order in the State Court Actions approving a stipulated agreement between HR Properties and IVRC as a means of "fostering peace and civil coexistence" during the pendency of litigation; IVRC members were temporarily allowed to remain on a portion of the premises while HR

---

[7] That case is <u>Comite de Vecinos de Isla Verde et al. v. HR Properties et al.</u>, FPE 2005-0268.

[8] That case is <u>Compañia de Parques Nacionales v. HR Properties, et al.</u>, FAC 2005-0513.

Properties continued to use a portion for a parking lot.[9]  (Docket
No. 71-1 at p. 18.)   The next day, FirstBank submitted to TSG a
notice of claim and request for legal representation under its
Lender's Policy in connection with the State Court Actions.   Id.
FATIC ultimately approved FirstBank's request for legal
representation in the State Court Actions on August 30, 2005,
subject to an express reservation of rights and thereafter retained
counsel for FirstBank.  Id.; Docket No. 67 at ¶ 23.  Subsequently,
on March 5, 2007, Chicago Title Insurance Company filed a complaint
in this Court (hereinafter "the Federal Court Action") against
Sunshine.[10]  (Docket No. 71-1 at p. 18; Docket No. 67 at ¶ 26.)
FirstBank was not a party to, and did not participate as such in,
the Federal Court Action.  (Docket No. 71-1 at p. 20.)

  C.   **CH Properties's Request for Coverage**

      It was not until March 4, 2009, that CH Properties
tendered its notice of claim to FATIC under the Owner's Policy in
relation to the State and Federal Court Actions via letter
addressed to FATIC's outside local counsel, Jose A. Fernandez-
Jaquete.  (Docket No. 71-1 at p. 20; Docket No. 67 at ¶ 29.)

---

      [9] To this day, members or representatives of IVRC and other
squatters continue to occupy the leased property.  (Docket No. 67
at ¶ 17.)

      [10] Because the subject of Chicago Title's lawsuit is a matter
relevant to whether CH Properties may recover reimbursement for
fees in the Federal Court Action, the Court does not discuss the
factual background of the case here.

Specifically, CH Properties requested coverage and legal defense, as well as reimbursement of the attorneys' fees and expenses it had incurred up to that date in both the State and Federal Court Actions. (Docket No. 71-1 at pp. 20-21.) It also claimed in its letter that it had not received a copy of the Owner's Policy and had only "recently" become aware of the existence of the Owner's Policy during a deposition taken in the Federal Court Action in October 2008. Id. at p. 21.

On March 16, 2009, FATIC confirmed receipt of CH Properties's letter, and on May 22, 2009, sent a letter to CH Properties's counsel indicating that FATIC would provide CH Properties with legal defense in the State Court Actions, with an express reservation of rights under the terms of the Owner's Policy, including its Exclusions from Coverage and the exceptions set forth in the policy's Schedule B. (Docket No. 71-1 at p. 21; Docket No. 67 at ¶ 30.) FATIC indicated that it had contacted the law firm of Cancio Nadal Rivera & Diaz to inquire about their availability to assume CH Properties's legal representation in the State Court Action, because they were currently representing FirstBank in the same litigation. (Docket No. 55-29 at pp. 11-12.) FATIC clarified that it would tender legal defense in the State Court Action on a prospective basis only, and for the purpose of defending CH Properties's leasehold right over the property, but only to the extent justified by the Policy. Id. at pp. 12. FATIC

also directed CH Properties to Section 3 of the Policy, which required the insured to notify FATIC in a "timely manner and in writing" of the State Court Action. Id. at p. 13.  It claimed that "Insured's failure to comply with said notice requirement has prejudiced [FATIC] as otherwise it would have retained single counsel to represent both the Insured and FirstBank at a much earlier stage of the proceedings." Id.  It also noted, "[H]owever plausible it may be that the Insured had forgotten it had purchased title insurance, as implied in your first letter, such memory lapse or oversight does not relieve [CH Properties] of its contractual obligation to serve notice to [FATIC] in a timely manner, much less relieve it of the repercussions of its delayed notice." Id. Consequently, it denied CH Properties's request for reimbursement of attorney's fees and expenses incurred in the State Court Actions up to that date. Id. Regarding the Federal Court Action, however, FATIC declined CH Properties's request for legal defense, stating that CH Properties's "title is not being disputed or somehow questioned in those proceedings.  Said litigation does not involve an alleged defect, lien, encumbrance, or other matter insured against by the Policy, but rather revolves around the interpretation of a contract clause that, regardless of how it is interpreted, has no impact or effect whatsoever on the validity of [CH Properties]'s title as insured under the Policy."  (Docket No. 55-29 at p. 12.)

On June 5, 2009, CH Properties responded to FATIC, again claiming that it had never received an original or copy of the Owner's Policy from FATIC; objecting to the representation of Cancio Nadal Rivera & Diaz in the State Court Action due to potential conflicts of interest in the law firm's representation of FirstBank; and arguing that even if the Federal Court Action would not affect the title, its intent is to limit CH Properties' "ability to claim against Seller for Warranty of Title, and thus could limit FATIC's right of subrogation to claim such damages if it pays the Insured or Bank under the policy." (Docket No. 55-29 at pp. 15-17.)  FATIC responded in a letter dated July 21, 2009, to CH Properties, allowing the insured to use its independent counsel instead of retaining Cancio Nadal Rivera & Diaz, and detailing the terms of engagement for proceeding with the legal actions. Id. at pp. 20-24.  CH Properties returned the executed engagement letter to FATIC on August 7, 2009, id. at pp. 25-26, and FATIC paid all of the subsequent bills for legal fees and costs incurred by the law firm of Andreu & Sagardia who had been retained to defend CH Properties in the State Court Action.  (Docket No. 67 at ¶ 33.)

**D.   Progress of the State and Federal Court Actions**

On June 29, 2011, the Commonwealth Court approved a stipulation by the parties and dismissed State Court Action FAC 2005-0513 with prejudice. (Docket No. 71-1 at p. 24; Docket No. 67 at ¶ 41.)  FPR 2005-0226 was also dismissed when the Municipality

of Carolina voluntarily dismissed its claims in December 2009,
after HR Properties withdrew its permitting application before the
Puerto Rico Planning Board.  (Docket No. 71-1 at p. 24; Docket
No. 67 at ¶ 41.)   The third State Court Action, FAC 2005-0268,
progressed to partial summary judgment, in which the Commonwealth
Court dismissed the complaint and ratified the validity of the
Lease Agreement.  (Docket No. 71-1 at p. 25; Docket No. 67 at
¶ 42.)   On February 17, 2012, however, the Puerto Rico Court of
Appeals set aside the Commonwealth Court's judgment "based on the
fact that, regardless of the grounds on the merits stated by TPI
[the Court of First Instance], the plaintiffs-appellants [IVRC]
lack standing to file their claims in the Puerto Rico General Court
of Justice.  When a court of law considers a matter that is not
subject to adjudication by the courts, all orders or decisions on
the merits are unenforceable."[11]  (Docket No. 55-22 at pp. 2, 39.)
In the Federal Court Action, the parties reached a settlement
agreement, and the Commonwealth dismissed the case with prejudice
on March 29, 2011.  (Docket No. 71-1 at p. 25.)

        CH Properties has not assigned, sold, transferred, or
conveyed its leasehold interest over the Property and remains to

---

[11] The Court of Appeals abstained from adjudging the validity
of the Lease Agreement because any such determination would be an
advisory opinion.  (Docket No. 55-22 at p. 2.)  That judgment is
the highest court determination regarding that matter, because IVRC
opted not to appeal to the Supreme Court of Puerto Rico.  (Docket
No. 67 at ¶ 45.)

this day the Property's lessee.  (Docket No. 71-1 at p. 26.)   It has been unable to use and enjoy the Property fully, however, pursuant to its leasehold rights.  Id. at p. 27.  Instead, it has only used approximately one acre of land as a parking lot for employees of the Mariott Courtyard hotel.  (Docket No. 67 at ¶ 46.) CH Properties claims that it is unable to develop the Property as originally intended or for any other commercial purpose, and claims damages from its continued inability to use its land.  (Docket No. 58-1 at pp. 9-10.)   Nonetheless, by virtue of the Loan Agreement and Mortgage Note, CH Properties is legally liable for the loan amount that it obtained from FirstBank, and this obligation includes the payment of interest at 12% annually over the principal amount of the loan.[12]  (Docket No. 71-1 at p. 30.)

On May 31, 2013, the Municipality of Carolina filed a complaint against CH Properties in the Commonwealth Court for the

---

[12] Beginning in September 2010, CH Properties stopped its payments under the Loan Agreement and Mortgage Note, and has remained in default ever since.  Id. at p. 31.  On February 16, 2011, FirstBank sold to CPG/GS PR NPL, LLC ("CPG/GS") various credit facilities, including CH Properties's Loan Agreement secured by the Mortgage, thus assigning to CPG/GS all of its rights, title, and interest under the Loan Agreement.  Id.  Subsequently, CPG/GS initiated litigation against CH Properties to collect on the Mortgage Note.  CPG/GS and CH Properties signed a Workout Agreement in which CH Properties exercised its option under "Section 3(C)" to pay the balance of CH Properties's Transfer Amount of $175,000 ($275,000 minus the two $50,000 deposits already paid) to CPG/GS through another entity, EFCO Management, Inc.  (Docket Nos. 55-40; 55-41; 55-7 at p. 5; 55-39 at p. 19.)  Mr. Eduardo Ferrer-Bolivar, who is president of CH Properties and also Ferrer-Ramirez's father, was the personal guarantor of that loan.  (Docket No. 55-3 at pp. 79-80; Docket No. 55-9 at pp. 5 & 15.)

collection of $1,307,776.14 in rents owed under the Assignment of
Lease through the month of October 2012.  Id.  CH Properties filed
a counterclaim in that action, alleging that the Municipality
violated obligations undertaken in the Endorsement Agreement and
also supported and allowed the disturbance of CH Properties's use
and enjoyment of the Property, all of which have caused CH
Properties economic harm.  (Docket No. 55-32 at pp. 3-8.)

## III. Motions for Summary Judgment

CH Properties asserts two causes of action against FATIC.
First, it claims that FATIC breached the Owner's Policy when it
denied reimbursement of legal fees incurred by CH Properties prior
to tendering CH Properties's March 2009 request for legal defense
in the State and Federal Court Actions.  (Docket No. 1-1 at pp.
5-6.)  Second, it claims damages resulting from the continued
disruption of its possession of the Property.  Id. at p. 7.  Both
parties seek summary judgment on each of those claims, which the
Court addresses in turn.

### A.   Denial of CH Properties's Request for Legal Expenses in the State Court Actions

#### 1.   The Parties' Contentions and Insurance Contract Provisions

Each party argues that the Court should rule in its
favor regarding whether FATIC's denial of reimbursement for legal
fees that CH Properties incurred in the State Court Actions prior
to CH Properties' March 4, 2009 tender was proper.  (Docket Nos. 54

at p. 5 & 58 at p. 10.)   FATIC argues that it properly provided "prospective" legal defense in the State Court Actions once it received CH Properties's written request, and that the Owner's Policy's plain language in no way required FATIC to reimburse CH Properties for fees incurred *before* written notice was given.[13]   CH Properties, on the other hand, contends that FATIC's implicit knowledge of the State Court Actions trumps any argument pursuant to Sections 3 and 4(a).   Because FATIC provided a defense to FirstBank under the Lender's Policy, actively monitored the State Court Actions, and therefore knew that CH Properties was named as a co-defendant, CH Properties argues that it was entitled to legal defense and fees even before it officially requested those services in writing.

      The main coverage provision of the Owner's Policy states:

---

[13] As discussed earlier, in its May 22, 2009 letter to CH Properties, FATIC denied CH Properties's request for reimbursement because Section 3 of the Policy required CH Properties to give timely notice of the State Court Actions.   (Docket No. 55-29 at p. 13.)   It claims that late notice prejudiced FATIC by causing "the engagement of multiple counsel to defend non-conflictive interests, thus unnecessarily and exponentially increasing litigation costs . . . ."   Id.

    In its briefs, FATIC claims that it had a legal basis to deny reimbursement for pre-tender defense costs based on "the clear terms of *Section 4(a)* of the Owner's Policy."   (Docket No. 84 at p. 3 (emphasis added).   By agreeing to provide defense prospectively, FATIC argues that it chose "not to activate the nullification or forfeiture clause of Section 3 of the Owner's Policy based on its perceived prejudice."   Id.   Rather, it invokes Section 4(a) to claim that "FATIC's duty to defend [was] expressly subject to the insured's tender of a written request."   (Docket No. 66 at p. 2.)

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS
> FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS
> AND STIPULATIONS, FIRST AMERICAN TITLE INSURANCE COMPANY,
> a California corporation, herein called the Company,
> insures, as of Date of Policy shown in Schedule A,
> against loss or damage, not exceeding the Amount of
> Insurance stated in Schedule A, sustained or incurred by
> the insured by reason of:
>
>   1.   Title to the estate or interest described in
>        Schedule A being vested other than as stated
>        therein;
>
>   2.   Any defect in or lien or encumbrance on the title;
>
>   3.   Unmarketability of the title;
>
>   4.   Lack of a right of access to and from the land;
>
> The Company will also pay the costs, attorneys's fees and
> expenses incurred in defense of the title, as insured,
> but only to the extent provided in the Conditions and
> Stipulations.

(Docket No. 8-1 at p. 1.)   Conditions and Stipulations Sections 3

and 4(a) provide relevant limits on FATIC's payment of those

expenses.   Section 3, titled "NOTICE OF CLAIM TO BE GIVEN BY

INSURED CLAIMANT," provides:

> The insured shall notify the Company promptly in writing
> (i) in case of any litigation as set forth in Section
> 4(a) below, (ii) in case knowledge shall come to an
> insured hereunder of any claim of title or interest which
> is adverse to the title to the estate or interest, as
> insured, and which might cause loss or damage for which
> the Company may be liable by virtue of this policy, or
> (iii) if title to the estate or interest, as insured, is
> rejected as unmarketable.   If prompt notice shall not be
> given to the Company, then as to the insured all
> liability of the Company shall terminate with regard to
> the matter or matters for which prompt notice is
> required; provided, however, that failure to notify the
> Company shall in no case prejudice the rights of any
> insured under this policy unless the Company shall be

Civil No. 13-1354 (FAB)                                              19

prejudiced by the failure and then only to the extent of
the prejudice.

(Docket No. 8-1 at pp. 2-3.)   Section 4(a), titled DUTY AND

PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE,

provides, in relevant part:

> (a) Upon written request by the insured and subject to
> the options contained in Section 6 of these Conditions
> and Stipulations, the Company, at its own cost and
> without unreasonable delay, shall provide for the defense
> of an insured in litigation in which any third party
> asserts a claim adverse to the title or interest as
> insured, but only as to those stated causes of action
> alleging a defect, lien or encumbrance or other matter
> insured against by this policy.

(Docket No. 8-1 at p. 3.)

### 2.   Legal Precedent and Analysis

The Court agrees with the parties that the law of

Puerto Rico applies to the dispute over the insurance policy.  See

U.S. Fire Ins. Co. v. Producciones Padosa, Inc., 835 F.2d 950, 953

(1st Cir. 1987) (taking into account both Erie R.R. Co. v.

Tompkins, 304 U.S. 64, 78, 82 L. Ed. 1188, 58 S. Ct. 817 (1938) and

"the parties's concession as to the applicable rules" in applying

Puerto Rico law to an insurance dispute).   The parties disagree,

however, over the extent to which the Puerto Rico courts have ruled

on the issue of reimbursement for pre-tender costs, fees, and

expenses.  Having reviewed the parties' numerous submissions and

wide-ranging proffered case law, the Court articulates the issue

that is truly at the heart of CH Properties's request for

reimbursement:   whether, under Puerto Rico law, an insurance

company that learns of a lawsuit in which its insured is a co-defendant and which potentially falls within policy coverage, has an affirmative duty to offer that coverage to the insured despite clear policy language directing the insured to provide a written "request" for the same.  Only if that were so, would CH Properties be entitled to pre-tender costs for its participation in the State Court Actions, because its failure to request coverage pursuant to Section 4(a) would be immaterial.  Because there does not appear to be conclusive Puerto Rico Supreme Court case law on that issue, the Court surveys legal authority to determine how the Commonwealth courts would likely rule.  See Fajardo Shopping Ctr., S.E. v. Sun Alliance Ins. Co. of P.R., Inc., 167 F.3d 1, 7 (1st Cir. 1999) ("[T]he Puerto Rico Supreme Court has recently established that since most of the insurance contracts sold in Puerto Rico are modeled after contracts drafted in the United States, both federal and state law principles are useful and persuasive.").

        The Court begins with CH Properties's argument that FATIC must provide reimbursement "unless it can prove that:  (a) it was not timely notified of the claims against the insured Lease Agreement, and (b) the insurer was prejudiced by said late notice." (Docket No. 71 at p. 3.)  While a first step in the right direction, that argument is not conclusive on the issue of reimbursement for pre-tender expenses because it only addresses the notice-prejudice rule.  The cases CH Properties relies upon address

the concept of prejudice and whether failure to promptly *notify* an

insurance company *of a claim* exonerates the insurer of its *duty to*

*defend*.[14]   Those cases support the conclusions (1) that FATIC had

timely notice of the Commonwealth claims against CH Properties

through its independent representation of FirstBank in the State

Court Actions, and (2) that its knowledge forecloses any prejudice

---

[14] In <u>Municipality of San Juan v. Great Am. Ins.</u>, 813 F.2d 520, 521 (1st Cir. 1987), the insured notified its insurance carrier, Great American, of an impending claim and requested that Great American assume its legal representation in the case.  813 F.2d at 521.  Great American did not respond, so the insured hired outside counsel and subsequently did not notify Great American once the claim was officially filed.  <u>Id.</u>  Like FATIC in this case, Great American received notice of the claim "since the insurer represented a codefendant in the same litigation," but it was not until years later that the insurer agreed to provide coverage and legal representation to the insured.  <u>Id.</u>  Granting legal representation only prospectively, the insurance company declined to reimburse the insured for fees incurred since the lawsuit's inception, arguing that the insured had failed to promptly notify Great American of the lawsuit.  <u>Id.</u>

The Puerto Rico Supreme Court's analysis — and the First Circuit Court of Appeals's subsequent application — of the certified questions in <u>Great American Insurance</u> focused on the insurance company's duty to defend its insured, which arose from an initial request for representation made even before litigation initiated.  <u>See generally</u>, 813 F.2d 520.  Even though the insured failed to promptly notify Great American of the lawsuit once it commenced, no prejudice resulted because Great American independently knew of the litigation by virtue of its representation of a codefendant.  <u>Id.</u> at 521, 523–24.  Because it had suffered no prejudice, Great American was not relieved of its duty to defend.  <u>Id.</u> Great American's failure to notify the insured of its willingness to defend thus constituted a breach of that duty, and the Puerto Rico Supreme Court determined that an appropriate remedy was reimbursement for the litigation expenses incurred.  <u>Id.</u> at 524.  Thus, the ultimate conclusion that the insured was entitled to reimbursement rested upon an analysis of the breach of a duty to defend, given the insured's original request *and* the absence of prejudice.

argument FATIC may have advanced in order to shirk its duty to defend CH Properties in the State Court Actions.  The cases do not, however, conclusively establish that an insurer, even with knowledge of litigation and no resulting prejudice, must reimburse an insured's expenses from a time period, unlike the facts in Great American, in which no prior *request* for representation was made.

A leading treatise on insurance law explains that "[e]ven if a delay does not operate to relieve an insurer of its obligation to defend altogether, an insurer is not liable for the pre-tender costs of defense incurred by the insured irrespective of the existence of prejudice."  14 Couch on Ins. § 200:34 (2014).  As FATIC points out, (Docket No. 54 at p. 7) (citing cases), that is the majority view.  Liberty Mut. Ins. Co. v. Black & Decker Corp., 383 F. Supp. 2d 200, 207 n.5 (D. Mass. 2004) ("Liberty Mutual rightly notes that the principle stated in [Hoppy's Oil Serv., Inc. v. Ins. Co. of N. Am., 783 F. Supp. 1505, 1509 (D. Mass. 1992)] is the majority rule, and cites two treatises to that effect.").  Many courts thus hold that even despite an insurer's knowledge of litigation against its insured, no duty to defend attaches *unless and until the insurer receives an indication that its participation is desired*.  See, e.g., Hartford Accident & Indem. Co. v. Gulf Ins. Co., 776 F.2d 1380, 1383 (7th Cir. 1985) ("Mere knowledge that an insured is sued does not constitute tender of a claim.  What is required is knowledge that the suit is potentially within the

policy's coverage coupled with knowledge that the insurer's assistance is desired.") (citations omitted); id. ("An insurance company is not required to intermeddle officiously where its services have not been requested.") (citation omitted); Ingalls Shipbuilding v. Fed. Ins. Co., 410 F.3d 214, 227 (5th Cir. 2005) ("Transocean is a sophisticated party and, as such, could have been expected to request a defense under the policy if it had desired one.  And, it would be absurd to require an insurance company to force itself on such a sophisticated party if its services have not been requested."); Aetna Casualty & Sur. Co. v. Chicago Ins. Co., 994 F.2d 1254, 1261 (7th Cir. 1993) (citing Hartford and concluding that "[b]ecause Celer failed to take the crucial, preliminary step of tendering his defense to Chicago, [] Chicago's policy coverage was never triggered."); Erie Ins. Exch. v. V.I. Enters., 264 F. Supp. 2d 261, 264-65 (D.V.I. 2003) (citing Aetna and Hartford for the same proposition and concluding that the insurer "had the right to wait for a tender before taking action.").  A majority of precedent thus suggests that even with timely notice and a lack of prejudice, FATIC did not have an obligation to provide legal services in the State Court Actions — and thus reimburse costs for those services — unless and until its insured requested them. Clear and unambiguous terms in the insurance contract indeed support that interpretation, as FATIC explicitly predicated its agreement to provide legal representation "upon written request by

the insured," (Docket No. 8-1 at p. 3), and CH Properties did not request coverage until 2009.

Cognizant that "where a contract's wording is explicit and its language unambiguous, the parties are bound by its clearly stated terms and conditions, with no room for further debate," Lopez & Medina Corp. v. Marsh USA, Inc., 667 F.3d 58, 64 (1st Cir. 2012), the Court is, however, swayed by an opposing trend favoring reimbursement for the insured that has emerged even despite policy language requiring written requests for coverage.[15] In Black & Decker, District Judge Douglas P. Woodlock comprehensively reviewed cases extending the prejudice analysis applicable in duty to defend cases to pre-notice cost cases. 383 F. Supp. 2d 200 at 207. Judge Woodlock found the following analysis to be "especially insightful" on that matter: "The duty to defend pre-exists any obligation on the part of the insured as to notice or compliance with the voluntary payment provision of an insurance contract . . . . The duty arises when the underlying claim is brought and thus pre-exists the insured's obligation to notify its insurer of that suit." Id. at 205 (citing Aetna Cas. & Surety Co. v. Dow Chem. Co., 44 F. Supp. 2d 847 (E.D. Mich. 1997)).

---

[15] By delving into the policy behind title insurance, courts have held that strict provisions requiring written notice or requests for coverage "confuse events with give rise to the duty to defend . . . and events which give rise to an insurer's breach of that duty." Black & Decker, 383 F. Supp. 2d at 205 (citation omitted).

Civil No. 13-1354 (FAB)                                              25

Judge Woodlock then cited a Maryland state court of appeals case at
length, to advance the proposition that "the duty to defend,
rationally, should attach at the same moment the correlative right
to control attaches, i.e., when an insured occurrence happens.  If
that is when the insurer has a right to exercise control, that is
also when its duty to do so should arise." Black & Decker, 383 F.
Supp. 2d at 206 (citing Sherwood Brands, Inc. v. Hartford Accident
& Indem. Co., 347 Md. 32, 698 A.2d 1078 (Md. 1997)).

> The Maryland court acknowledged that many courts had held
> that the duty to defend does not arise until notice is
> given, and agreed that "[in states] where the duty of
> notification is regarded as a condition precedent to the
> insurer's duty to defend, a holding that the duty to
> defend does not arise until the notice is given is
> logical."  But it concluded that such a rule made no
> sense in a state (like, I note, Massachusetts) that
> requires prejudice for a late notice defense:
>
> Where, as in Maryland, however, the duty to notify is
> merely a covenant that, absent a showing of prejudice,
> does not excuse the insurer from complying with its duty
> to defend, the logic of such a holding becomes
> significantly attenuated, for it creates a time gap
> between the insurer's right to control the defense and
> its duty to provide one that has no legal underpinning.

Black & Decker, 383 F. Supp. 2d. at 206 (citations omitted).

        Just as Judge Woodlock compared Massachusetts to
Maryland to reach his conclusion that pre-notice defense costs are
recoverable absent prejudice, the Court turns to Puerto Rico's
stance on prejudice and notice.  CH Properties's reliance on Great
American is particularly pertinent here, because it includes the
Supreme Court of Puerto Rico's answers to certified relevant

questions.   In that case, the Supreme Court of Puerto Rico
indicated that prejudice *is necessary* "to relieve an insurer from
its contractual duty to defend an insured when the latter has
breached a condition precedent requiring the prompt forwarding of
summons to the insurer," and that "an insurer's knowledge that a
complaint has been filed against the insured preclude[s] a finding
of prejudice." <u>Great Am. Ins.</u>, 813 F.2d at 522.  Puerto Rico thus
joins states like Massachusetts and Maryland in requiring prejudice
for the late notice defense, and in those jurisdictions "notice is
deemed an independent obligation of the insured, not a condition
precedent to coverage." <u>Black & Decker</u>, 383 F. Supp. 2d at 207.
Applying Judge Woodlock's reflections, "[t]he widely-followed late
notice doctrine under which post-notice costs are recoverable
absent prejudice, but pre-notice costs are *per se* excluded, is in
tension with the underpinnings of [Puerto Rico's] analysis of the
notice clause." <u>Id.</u>  Insurance contracts in Puerto Rico require
"liberal construction in favor of the insured,"[16] <u>Lopez & Medina
Corp.</u>, 667 F.3d at 65 (citations omitted), and "when in doubt about
the interpretation of a policy, it should be resolved taking into
consideration the purpose of the policy:  to provide protection to
the insured," <u>Quiñones-Lopez</u>, 1996 P.R.-Eng. 499,244.  The Court

---

[16] The Supreme Court of Puerto Rico has indicated that, "[t]his
rule, however, does not compel constructions in favor of the
insured when a clause favors the insurer, and its meaning and scope
is clear and unambiguous." <u>Quiñones-Lopez v. Manzano-Pozas</u>, 1996
P.R.-Eng. 499,244, 1996 WL 499244 (P.R. June 25, 1996).

Civil No. 13-1354 (FAB)                                                    27

thus believes that the Supreme Court of Puerto Rico "would find that pre-notice defense costs are recoverable absent prejudice." <u>Black & Decker</u>, 383 F. Supp. 2d at 207.

Regardless of CH Properties's incredulous allegations that it was unaware of the title insurance policy until

2008,[17] it had consistently been paying premiums to FATIC for the Owner's Policy, which was issued in 2002.  As discussed above, the Court believes that the Puerto Rico Supreme Court would find that FATIC's duty was triggered as soon as the State Court Actions against CH Properties were filed in April 2005.  FATIC learned of

---

[17] The parties vehemently dispute who, if anyone, received the Owner's Policy on the date of closing.  Ferrer-Rarmirez's testimony has been that the Owner's Policy was not delivered on the date of closing, and that the Loan Settlement Statement prepared by FirstBank did not signify the financing of the Owner's Policy. (Docket No. 55-16, Docket No. 55-3 at pp. 34-36, 55-58, 65.)  It relies on the invoices for the Owner's Policy issued by FATIC to argue that all of the invoices were sent directly to FirstBank and not CH Properties.  (Docket No. 58-1 at pp. 2 & 148.)  Moreover, the closing document dated August 5, 2002, does not list the Owner's Policy among the "copies" of documents maintained by FirstBank in its files.  (Docket No. 58-1 at pp. 176-77.)  As noted above, CH Properties claimed in its March 4, 2009, letter to FATIC's outside counsel, Fernandez-Jaquete, that it had not received a copy of the Owner's Policy and had only "recently" become aware of the existence of the Owner's Policy during a deposition taken in the Federal Court Action in October 2008. (Docket No. 71-1 at p. 21.)

FATIC, on the other hand, argues that as part of the transaction for purchase of the leasehold by CH Properties, FirstBank financed the payment of the premium and insurance charges in connection with both the Lender's and Owner's Policies.  (Docket No. 55-3 at pp. 32-33, 55-58; Docket No. 55-15 at pp. 38-44.)  It submits that Ferrer-Ramirez signed a Loan Settlement Statement on August 2, 2002, which reflects amounts for "Title Insurance" ($9,674.25) and "Title Charges" ($6,778.75) that correspond with the amounts itemized in a Mortgage Loan Check issued by FirstBank on the same date in favor of TSG for a total of $16,453.  (Docket No. 55 at p. 11) (citing Docket Nos. 55-16, 55-17, 55-3 at pp. 55-58, & 55-15 at pp. 38-44).  Furthermore, it claims that TSG invoices dated August 2, 5, and 6, 2002, prepared to the attention of Ferrer-Ramirez, also reflect charges that add up to and correspond with the amount indicated in the Loan Settlement Statement and that was paid to TSG on August 5, 2002 through Mortgage Loan Check No. 177047.  (Docket No. 55 at p. 11) (citing Docket Nos. 55-18, 55-19, 55-20, 55-16, & 55-17).

CH Properties's involvement as a co-defendant in the State Court Actions as early as June 2005, when FirstBank submitted a request for legal representation in the suit.  Indeed, FATIC's outside legal counsel admitted that the insurance company not only knew about the State Court Actions, but had been actively "*monitoring all three*" by the date of CH Properties's March 2009 tender letter. (Docket No. 58-1 at p. 41.)  FATIC's reliance on the Policy's written notice language is nothing more than an invocation of a semantic loophole that would allow the insurance company to shirk its duty and side-step the bargain originally struck between the parties in the Policy.  "The insured paid for the insurer's promise to defend the insured for covered claims," and "[o]nce the insurer's duty to defend is triggered, it must begin defending the suit or bring a declaratory action if it believes the policy does not cover the claim." Home Ins. Co. v. Nat'l. Union Fire Ins., 658 N.W.2d 522, 533 (Minn. 2003).  It follows from Great American that FATIC was not prejudiced by CH Properties's late notice, and the same can be concluded regarding the late request for representation.  Indeed, once CH Properties requested representation in 2009 and FATIC suggested FirstBank's counsel, CH Properties objected on conflict grounds, and FATIC ultimately approved the continued representation by Andreu & Sagardia Law Firm as CH Properties's legal counsel in the State Court Actions.  The fact that FATIC had been "monitoring" and even provided coverage

for FirstBank in the State Court Actions weighs against a finding
of prejudice.  The Court declines to construe the written notice
clause as dispositive in this case that CH Properties's pre-notice
defense costs are unrecoverable.  Quiñones-Lopez, 1996 P.R.-Eng.
499,244 ("[N]ice constructions that would allow insurers to dodge
liability are not favored.").

> Finally, the Court echoes the sentiments that:

> Forcing the insurer to [begin defending the suit or bring
> a declaratory action] as soon as it receives notice of a
> claim helps the parties move on with the underlying suit.
> Once an insurer receives notice of a suit, it is
> responsible for defending the insured unless the insured
> explicitly refuses the insurer an opportunity to defend.

> The relationship of an insured to its insurer is not one
> of equals, and a rule defining tender as notice and
> opportunity to defend reflects that disparity . . . . We
> will not create a legal rule that presumes an insured,
> whether a company or an individual, is equally
> sophisticated, knowing its contractual right to coverage
> and when and how to invoke it.  Nor will we create a rule
> that interprets an insured's silence as a statement of
> intent to forgo the insurer's assistance.  Indeed,
> insurers are better able to facilitate clear
> communication between the parties.

Home Ins. Co., 658 N.W.2d at 533 (quotations and citations
omitted).  Thus, the Court follows several states' leads in ruling
that in Puerto Rico, once an insurer receives notice that its
insured has been sued in a suit that potentially falls within
policy coverage, "even without an express request for a defense, it
should be the responsibility of the insurer to contact the insured
to determine whether the insurer's assistance in the suit is

required." Id. (quotations and citations omitted).[18]  Because the

filing of the State Court Actions in 2005 triggered FATIC's duty,

and it suffered no prejudice due to CH Properties's late notice or

request for representation, FATIC is liable to reimburse CH

Properties's pre-tender defense costs incurred in the State Court

Actions.  Accordingly, CH Properties's motion for summary judgment

on the issue of reimbursement for State Court Actions expenses is

**GRANTED IN PART**.[19]

### B.    Denial of CH Properties's Request for Legal Expenses in the Federal Court Action

The parties next dispute whether FATIC properly denied CH

Properties's request for legal defense in the Federal Court Action.

Title insurance contracts impute a duty on the insurer to defend

its insured against "claims that are adverse to the insured title

or interest, at least to the extent that the claims allege defects,

liens, encumbrances, or other matters that are within the policy's

coverage."  1 Joyce D. Palomar, Title Ins. Law § 11:2 (2013-14

ed.).  That duty to defend "is measured by the allegations in a

---

[18] "The burden we are placing on the insurer with this rule is
not onerous . . . . When notified of the insured's potential
liability under the suit, the insured can simply ask the insured if
the insurer's involvement is desired, thus eliminating any
uncertainty on the question." Home Ins. Co., 658 N.W.2d at 533.

[19] Genuine issues of fact remain regarding the appropriateness
of CH Properties's hiring of Attorney Pedro Rosario Urdaz and the
reasonableness of the fees paid to Andreu & Sagardia. (See, e.g.,
Docket Nos. 84 at pp. 7-8). The Court thus reserves judgment on
the amount of reimbursement to be provided by FATIC until a hearing
can be held on those issues.

plaintiff's complaint — if any of these allegations, read
liberally, state facts that would be covered by a [] policy if
proven true, then the insurer must provide a defense for the
insured defendant." Jewelers Mut. Ins. Co. v. N. Barquet, Inc.,
410 F.3d 2, 15-16 (1st Cir. 2005) (construing Puerto Rico law).  A
court "should examine all the allegations made by the plaintiff
and, based on a joint interpretation of the same, determine whether
there is a possibility that the insured is protected by the policy
issued in his [or her] favor." Pagan Caraballo v. Silva, Ortiz, 22
P.R. Offic. Trans. 96, 102, 1988 WL 580770 (1988) (collecting case
law on that point).  "Any doubt about the insurer's duty to defend
a specific case must be resolved in favor of the insured.  This
type of obligation subsists even if the suit is groundless, false
or fraudulent." PFZ Props. v. Gen. Accident Ins. Co., 136 D.P.R.
881, P.R. Offic. Trans. (1994) (citations omitted).  To determine
whether CH Properties was entitled to a defense in the Federal
Court Action, the Court invokes the "eight corners rule," comparing
the Policy's "four corners" with the Federal Court Action
complaint's "four corners."  1 Palomar, § 11:2.

        On March 5, 2007, Chicago Title filed a complaint[20] in
this Court seeking declaratory relief "to declare the rights,
status and legal relations of Chicago Title and Sunshine" pursuant

---

        [20] The complaint was later amended, on July 13, 2007, to
include HR Properties and CH Properties.  The case is Chicago Title
Ins. Co. v. Sunshine Isle Inn, LLC, et al., Civil No. 07-1190.

to a leasehold owner's policy Chicago Title had issued to Sunshine.
(Docket No. 55-26 at p. 3.)   Chicago Title issued its owner's
policy to Sunshine "to insure Sunshine's acquisition of a certain
leasehold interest by way of an Assignment of Lease dated August 9,
1999 from Desarrollos Hoteleros de Carolina (hereinafter referred
to as 'the Leasehold')."   Id.   Sunshine subsequently "sold,
assigned and transferred its leasehold interest" to CH Properties,
and HR Properties "assigned its right to acquire the Leasehold from
Sunshine." Id. at pp. 3-4.  As alleged in Chicago Title's Second
Amended Complaint, Sunshine was sued in one of the consolidated
State Court Actions, and CH and HR Properties filed a cross-claim
against Sunshine, based on a warranty of title provision included
in the 2001 Sale-Purchase Agreement.[21] Id. at p. 6.  Chicago Title
ultimately claimed that a controversy existed between Chicago Title
and Sunshine "concerning the existence and extent of the
contractual duty to defend or indemnify, if any, of Chicago Title
to Sunshine." Id. at p. 7.  It further stated:

> HR and CH are made parties to this action as their
> contract they have with Sunshine to acquire the leasehold
> premises object of this action, may determine Sunshine's
> rights under the title insurance contract.  Such rights
> largely on [sic] this Honorable Court's determination of

---

[21] By FATIC's own admission, "the warranty of title provision
in the Sale-Purchase Agreement was arguably a covenant of warranty
that continued Sunshine's insurable estate or interest under the
Chicago Title policy, despite Sunshine's assignment of the lease to
CH Properties in 2002." (Docket No. 54 at p. 14.)  There is no
indication, however, that the covenant of warranty was the subject
of the Owner's Policy that FATIC provided to CH Properties.

the rights between Sunshine and HR/CH pursuant to the
Leasehold contract . . . . The issuance of declaratory
relief by this Court will terminate all or most of the
existing controversy between the parties as it pertains
to the [title insurance] Policy.

Id. at p. 8.  In its prayer for relief, Chicago Title sought a

declaration that "Sunshine sold the leasehold interest on August 5,

2002, and that it did not retain an estate or interest in the

insured leasehold"; that "if there is a continuation of the

insurance, and the warranty of title in the Leasehold expired 90

days after the sale by the express terms of the Sale-Purchase

Agreement [between Sunshine and HR/CH Properties] . . . the Policy

has expired because Sunshine no longer has liability by reason of

covenants of warranty"; that "if the 90 day clause is not

applicable to this action, and there is a continuation of insurance

after the conveyance of title, the maximum indemnity obligation of

Chicago Title in favor of Sunshine is $250,000.00"; and that

"Chicago Title has no duty to defend the action filed against

Sunshine." Id. at pp. 8-9.

A review of the "four corners" of the Owner's Policy

between FATIC and CH Properties reveals that FATIC promised to

provide CH Properties with insurance against loss or damage

"sustained or incurred by the insured by reason of: title to the

estate or interest described in Schedule A being vested other than

as stated therein; any defect in or lien or encumbrance on the

title; unmarketability of the title; and lack of a right of access

to and from the land." (Docket No. 8-1 at p. 1.)  It also declared

that it would "pay the costs, attorneys' fees and expenses incurred

in defense of the title, as insured, but only to the extent

provided in the Conditions and Stipulations." Id. Section 4(a) of

the Policy's Conditions and Stipulations further provided that the

duty to defend covers "the insured in litigation in which any third

party asserts a claim adverse to the title or interest as insured,

but only as to those stated causes of action alleging a defect,

lien or encumbrance or other matter insured against by this

policy." Id. at p. 3.

        The Court notes both parties' lack of development in

their arguments regarding whether Chicago Title's allegations even

possibly fall within the scope of FATIC's title insurance policy

for CH Properties.  CH Properties contends that Chicago Title's

allegations "fall squarely within the four corners of the Owner's

Policy" because they are so "intertwined to the Lease Agreement, to

the point that it amounted to a claim adverse to the title."

(Docket No. 71 at p. 9.)  The only support for CH Properties's

argument, however, is the following sentence:

> In that sense, any determination in the Federal Action
> either eliminating or restricting Sunshine Isle's
> potential liability in the event of the Lease Agreement's
> annulment would have adversely impacted both CH
> Properties and FATIC, as their rights and prerogatives to
> demand compensation from Sunshine Isle as seller of the
> Lease Agreement would have been completely diminished.

Id.  FATIC merely offers a blanket denial that it owed any duty to defend the Federal Court Action, arguing only that none of Chicago Title's allegations "touched upon or challenged the validity or enforceability of CH Properties'[s] leasehold title, much less that it was subject to any liens, encumbrances or defects of the kind insured against under the Owner's Policy."  (Docket No. 54 at p. 15.)[22]  FATIC does nothing to counter CH Properties's proposition that Chicago Title's allegations amount to a claim adverse to the title or interest insured.

An insurer's duty to defend in Puerto Rico is broader than its duty to indemnify, and that "any doubt" regarding whether a duty to defend exists must be decided in the insured's favor.  Pagan Caraballo, 22 P.R. Offic. Trans. 96.  After a review of Chicago Title's pleadings, however, the Court cannot deduce how any allegation, even read liberally, states facts that would be covered by FATIC's Owner's Policy.  The Owner's Policy insures CH Properties's leasehold interest in the 5-*cuerda* tract of land in Isla Verde.  See Docket No. 8-1; Perez-Sanchez v. Advisors Mortg. Investors, Inc., 130 D.P.R. 530, P.R. Offic. Trans. (1992)

_____

[22] FATIC explains its reasoning in one sentence in its communication with CH Properties in which it denied the latter's claim for representation:  "Said litigation does not involve an alleged defect, lien, encumbrance, or other matter insured against by the Policy, but rather revolves around the interpretation of a contract clause that, regardless of how it is interpreted, has no impact or effect whatsoever on the validity of [CH Properties]'s title as insured under the Policy."  (Docket No. 55-29 at p. 12.)

(defining title insurance as "contracts whereby the insurer, for a valuable consideration, agrees to indemnify the insured in a specified amount against loss through defects of title to, or liens or encumbrances upon realty in which the insured has an interest as purchaser or otherwise"); see also P.R. Laws Ann. tit. 26, § 410 (2011) (Title insurance insures risks "against loss by encumbrance or defective titles or invalidity or claims adverse to title and services connected therewith.").  Nowhere does Chicago Title's complaint allege a defect in CH Properties's leasehold, liens, or encumbrances upon the leasehold, or otherwise threaten the validity of the leasehold.  To the contrary, Chicago Title sought to define the scope of its own title insurance policy with Sunshine and to limit its own liability *due to the already filed State Court Actions against CH Properties and Sunshine*.  As CH Properties argues, an outcome in the Federal Court Action limiting Chicago Title's obligations to insure Sunshine surely would have adversely impacted CH Properties and FATIC's ability to receive compensation from Sunshine in the event that the Commonwealth court nullified the Lease Agreement.  Because Chicago Title's allegations do not directly contest or otherwise affect the validity of the leasehold themselves, there is simply no basis for concluding that the facts in the complaint amount to a "claim adverse to the title or interest insured."  Thus, the "eight corners rule" does not impute a duty to defend onto FATIC for the Federal Court Action.

Accordingly, FATIC's motion for summary judgment on that ground is **GRANTED**, and CH Properties's request for reimbursement for the Federal Court Action costs is **DENIED.**

Although not a clear-cut case where the facts easily fit into one of the Policy's exclusionary provisions, even "taking into consideration all the allegations in the original complaint and liberally construing the insurance policy in favor of the insured," the Court does not find that Chicago Title's allegations amount to a "claim adverse to the title." Accordingly, FATIC properly denied CH Properties legal representation in the Federal Court Action and is entitled to summary judgment on that ground.

**C.    FATIC Liability for CH Properties's Lack of Possession**

Pursuant to the Owner's Policy, FATIC also agrees to indemnify CH Properties for loss or damage sustained by reason of: (1) title being vested other than as stated in the Policy; (2) any defect in or lien or encumbrance on the title; (3) unmarketability of the title; or (4) lack of a right of access to and from the land. (Docket No. 8-1 at p. 1.) Due to the various trespassers who continue to occupy the Property, CH Properties claims that it has been both "deprived of its possession" of the Property and "unable to develop the condo-hotel intended for the parcel or to use the same in any other commercial manner" since 2005. (Docket No. 58 at p. 21.) Despite that alleged inability to enjoy its interest over the leasehold, CH Properties has paid approximately

$692,849.50 for rent, and $3,408,220.28 in mortgage interests. (Docket No. 58-1 at p. 10; Docket No. 67 at p. 13.)  It seeks to recover those amounts from FATIC, arguing that the trespassers' presence triggers indemnification coverage under the Owner's Policy.  The Court finds CH Properties's contentions meritless in each of the four coverage areas for a simple reason:  the trespassers' presence does not affect title to the leasehold interest.

### 1.   Title Being Vested Other than as Stated

The first provision, title vested other than as stated in Schedule A — "entitles the insured to compensation for either a complete failure of title or a diminished title." 1 Joyce D. Palomar, Title Ins. Law § 5:4 (2013–14 ed.).  Where Schedule A describes the title, "the insured purchaser has a claim if it is found either that the seller had no interest in the property or an interest less than [the interest described.]"  Id.  "Courts generally construe this insuring clause in a straightforward manner, holding the insurer responsible to indemnify the insured if title is not vested as stated in the policy."  1 Palomar § 5:4.

Schedule A of the Owner's Policy in this case specifies that "[t]he estate or interest in the land which is covered by th[e] policy is:  LEASEHOLD" and identifies the "Date of Policy" as August 5, 2002.  (Docket No. 8-1 at p. 4.)  Because neither party has put forth evidence that Sunshine entirely lacked

Civil No. 13-1354 (FAB)                                              40

title to the land, or that it possessed anything less than a
leasehold, the Court finds no basis for granting CH Properties's
claim for coverage under the first provision.

            By virtue of the trespassers' presence and the
various challenges to the Lease Agreement, however, CH Properties
argues that its "interest and rights under the [L]ease [A]greement,
including its right to enjoy and use the parcel," have been
"diminished" and claims that coverage pursuant to the first
provision is warranted. (Docket No. 58 at p. 8); (Docket No. 81 at
p. 7) (stating that CH Properties is "unequivocally entitled to
indemnity for the damages suffered as a consequence of its
continued inability to peacefully use and enjoy its rights under
the insured Lease Agreement.").  To support that argument, CH
Properties cites the Puerto Rico Insurance Code's definition of
"title insurance" as insurance against loss by "claim adverse to
title and services connected therewith," P.R. Laws Ann. tit. 26,
§ 410; the Civil Code's provision that "[i]n a lease of things, one
of the parties thereto binds himself to give to the other the
enjoyment or use of a thing for a specified time and a fixed
price," P.R. Laws Ann. tit. 31, § 4012 (2011); and the Puerto Rico
Supreme Court's indication that owner's title policies indemnify
"in case the titleholder sustains a loss or impairment of his or
her right," Perez-Sanchez, 130 D.P.R. 530.  (Docket No. 81 at
pp. 7-8.)

The Court does not find support in the law for CH
Properties's interpretation of "diminished" title.  In the spirit
of straightforwardness, title to the Property has not been deemed
to be vested as anything but a full leasehold in anyone other than
CH Properties.  Moreover, case law suggests that diminished title
results when a third party possesses a cognizable interest in the
property, thus reducing the interest originally sought to be
transferred between the original parties.  See 1 Palomar § 5:4
(citing Fohn v. Title Ins. Corp. of St. Louis, 529 S.W.2d 1 (Mo.
1975) (providing coverage to purchaser of a tract of land, when a
third party relayed to the new owners that they too had a deed to
the land); Scott v. Chicago Title Ins. Co., 2010 WL 3823452 (Colo.
Dist. Ct. 2010) (policy expressly covered risk of someone else
owning an interest in the insured's title); Moe v. Transamerica
Title Ins. Co., 21 Cal. App. 3d 289, 98 Cal. Rptr. 547 (1st Dist.
1971) (finding recovery under a title insurance contract
appropriate because bankruptcy rendered respondents' security
"totally valueless")).  That has not proven to be the case here,
insofar as the Puerto Rico courts dismissed the State Court Actions
that challenged the Lease Agreement's validity, and therefore the
Lease Agreement remains valid and enforceable.  (Docket No. 55-22
at pp. 18-23) (finding that neither the natural plaintiffs nor IVRC
or Amigos del Mar plaintiffs had standing to challenge the validity
of the Lease Agreement because they did not suffer a "clear,

palpable, real, immediate and precise" injury). Nothing demonstrates that the trespassers enjoy a legally cognizable interest in the Property affecting CH Properties's title, and therefore CH Properties is not entitled to coverage under the first indemnity provision.

### 2.   Defect in Lien or Encumbrance on the Title

The second indemnification risk FATIC undertook is the risk of loss by reason of "[a]ny defect in or lien or encumbrance on the title." (Docket No. 8-1 at p. 1.) Because the terms "defect," "lien," and "encumbrance" are not explicitly defined in standard title insurance policies, courts interpret the terms "loosely and interchangeably." 1 Palomar § 5:5. "Technically, a 'defect' exists in the insured title when a third party claims an interest which interferes with the insured's use of the property according to the estate or interest insured." Id. "A lien is a claim or charge on property as security for the payment of a debt or the fulfillment of an obligation." Id. "An encumbrance is any right of a third person in real property that diminishes the value of the insured's title but does not prevent the passing of the insured interest." Id. Resolution of the defect, lien, or encumbrance issue "depends on whether a given claim or state of facts can be considered to create a cloud on the title or to legally affect the ownership of the parcel." 11 Couch on Ins. § 159:30 (2014).

CH Properties advances the same arguments as before to seek coverage under the second coverage provision — that its rights and interests as the lessee in the Property have been "constantly diminished" due to the trespassers' presence and the litigation surrounding the Lease Agreement.  (Docket No. 81 at p. 8.) Confounding the first two insured risks, CH Properties claims that its:

> expectations as to its right to indemnification are entirely compatible with what commentators have recognized in terms of the coverage provided by this type of insurance. See, e.g., Palomar, Title Ins. Law, § 5:5 (2013–2014 ed.) (**A defect exists in the insured's title when a third party claims an interest which interferes with the insured's use of the property according to the estate or interest insured.**)  This type of insurance policies [sic] entitles the insured to compensation for either a complete failure of title or a **diminished title.** 1 Palomar, § 5:4.

Id. at p. 7 (emphasis in original).

CH Properties cites no case law or support for its layman's interpretation of the treatise language, and a review of the case law underlying the treatise's discussion does not support CH Properties's argument.  See generally 1 Palomar § 5:5 (providing examples of defects, liens, and encumbrances, none of which demonstrates how trespassers' presence clouds title).  The focus of the second policy provision is on the insured's *title*, and, as discussed above, no facts suggest that the validity of CH Properties's title to the Property is in jeopardy, much less affected by any defect, lien, and encumbrance.  The trespassers'

ongoing presence does not constitute an encumbrance on title, because "the mere presence of a matter that appears to affect title will not be cognizable under the policy if, in fact, the defect is without legal consequence." 1 Palomar § 5:5. The trespassers in this case entered the land to amplify their lawsuit challenging the Lease Agreement's validity in the name of public domain. Their continued presence was approved by court order as part of a State Court Action's settlement; thus, it cannot be seriously argued that they possess a legally cognizable interest amounting to a defect, lien, or encumbrance on the leasehold title. Furthermore, a title insurance policy indemnifies an insured "against claims that are asserted after the policy's effective date but, for the most part, only to the extent that they were caused by liens, encumbrance, or other title defects that existed *prior* to that date." 1 Palomar § 4:3 (emphasis in original). Only if a policy expressly assumes the risk of defects first created after the date in Schedule A, therefore, will the title insurer be liable on the policy. Id. Here, the alleged defects or encumbrances began when the trespassers entered the land in 2005 — nearly three years after the Lease Agreement vesting title in CH Properties was signed. Accordingly, CH Properties is not entitled to relief pursuant to the second indemnification provision.

### 3.    Unmarketability of Title

FATIC also insured against CH Properties's loss by reason of unmarketable title.  Pursuant to the Owner's Policy, unmarketable title is "an alleged or apparent matter affecting the title to the land . . . which would entitle a purchaser of the estate or interest described in Schedule A to be released from the obligation to purchase by virtue of a contractual condition requiring the delivery of marketable title."  (Docket No. 8-1 at p. 2.)  CH Properties repeats its contention under this provision that its insured Lease Agreement "has in fact turned unmarketable." (Docket No. 81 at p. 8.)  It provides no legal analysis of how its limited use falls under the language of the policy, however, and merely claims that "the mere risk of enforcement of an encumbrance or of a challenge to the title is sufficient to trigger coverage." Id. at p. 9.  That argument, which completely ignores the explicit policy language provided, does not lead to the finding that trespassers' presence renders title unmarketable.  See United Bank v. Chicago Title Ins. Co., 168 F.3d 37, 40 (1st Cir. 1999) ("Although courts vary in their understanding of title marketability, compare Chicago Title Ins. Co. v. Kumar, 24 Mass.App.Ct. 53, 506 N.E.2d 154 (1987), with Myerberg, Sawyer & Rue, P.A. v. Agee, 51 Md.App. 711, 446 A.2d 69 (1982), here the policy has a specific definition, and United Bank makes no effort to show that its concerns fell within this definition.").  In the

unmarketability provision context, moreover, "the insured will be indemnified for loss due to a finding that the title is unmarketable because of a defect which existed *prior to* the policy's effective date.  It does not insure that the title will remain marketable in the future."  1 Palomar § 5:7 (emphasis in original).  Just as the Court reasoned above, no basis exists for concluding that the title was unmarketable before CH Properties acquired title to the leasehold interest in August 2002, because the trespassers and litigation occurred nearly three years later.  CH Properties's argument that its title "has in fact turned unmarketable," therefore, is inapposite.

### 4.    Lack of a Right of Access

Finally, FATIC agreed to indemnify CH Properties by assuming a risk of loss from "lack of a right of access to and from the land."  (Docket No. 8-1 at p. 1.)  Pursuant to that fourth coverage provision, the loss insured against is inadequate or unreasonable "legal access" to property, in light of the insured's expectations.  1 Palomar § 5:8.  Courts construing that provision focus on whether an insured has the legal right to physically access his or her land.  Id. (compiling cases); id. ("The title insurer's obligation as to access is not satisfied by mere pedestrian access or by access to the insured land via only boat or seaplane.  Surely, insureds reasonably expect that insurance of a

right of access means they will have access to the insured property over land by car or truck.").

Curiously, CH Properties argues that it is entitled to coverage under the fourth provision because the Owner's Policy insures CH Properties's right to peaceful use and enjoyment of the leased land, which in Puerto Rico includes "not being dispossessed through violence and force by third persons." (Docket No. 81 at p. 9.) That argument is severely undeveloped and unpersuasive. Simply because the trespassers have been squatting on the Property — and in fact enjoyed court approval to remain there while litigation progressed — does not mean that CH Properties's legal access to its leased land is entirely foreclosed. Moreover, no evidence supports the conclusion that the 5-*cuerda* tract of land is physically inaccessible to the insured. Accordingly, the Court denies CH Properties's request for indemnity coverage under that provision.

In sum, all four insuring provisions for indemnification pursuant to the Owner's Policy require the existence of a title defect or a legally recognized claim against the title as insured. Because the trespassers' presence neither creates a defect in CH Properties's leasehold title nor arises from a legally cognizable claim against the title as insured, there is no basis for finding that the indemnification provisions have been

Civil No. 13-1354 (FAB)                                                    48

triggered. Accordingly, CH Properties's request for indemnification of its rent and mortgage payments is **DENIED.**

## IV. Conclusion

Plaintiff CH Properties's motion for summary judgment, (Docket No. 58), and FATIC's motion for summary judgment, (Docket No. 54), are **GRANTED IN PART and DENIED IN PART.** CH Properties's request for reimbursement for fees and costs incurred in the State Court Actions is **GRANTED.** Its request for reimbursement for the Federal Court Action is **DENIED.** Because it is not entitled to indemnification, its request for damages for rent and mortgage payments is **DENIED.**

The pretrial conference scheduled to be held **on September 19, 2014** is VACATED. In its stead, **a status conference will be held on that date at 9:00 a.m.** to discuss the appropriateness of CH Properties' hiring of Attorney Pedro Rosario-Urdaz and the reasonableness of the fees paid to Andreu & Sagardia.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, September 9, 2014.

                                        s/ Francisco A. Besosa
                                        FRANCISCO A. BESOSA
                                        United States District Judge